Good morning, Your Honors. My name is Henry Gonzalez. I represent the Plainfoot Senate Appellants, Outdoor Media Group, and Chant Outdoor LLC. I'd like to make a few what I believe to be simple points that I think will direct the outcome of this case. And the first one is that we've seen a lot of briefing from both the City and the League of California Cities regarding this case being a signed code shakedown case. And I would submit to this panel that that's not the case. One of the requirements of the City's own briefing for a signed code shakedown case is that a shakedown scenario requires that a claimant apply for multiple billboard permits knowing they will be denied due to noncompliance with regulations. That's not what happened here. My clients applied for these permits. The permit applications met the City's location criteria, met the City's size criteria, met all of the Municipal Code's signed criteria. My clients submitted these applications with the expectation that they would be granted. Now, they were not granted, and they were not granted for unconstitutional reasons. And if the Court reviews the District Court's decision and reviews the City's answering brief, it's clear that the decision below was based largely, if not completely, on the testimony of John Gunderson. And John Gunderson is the president of Outdoor Media Group. But that testimony was based on Mr. Gunderson's misunderstanding of the contract at issue. But does that mean the Court can't rely on it? No. At this point, that's what the record is. Understood, Your Honor. But the contract itself is also part of the record. Well, I've read his testimony, and I've read the contract. And I don't see any significant conflict between the two. The conflict that I – I appreciate that, Your Honor. The conflict that I would identify, Your Honor, is Mr. – Mr. Gunderson believed that it was Outdoor Media Group's responsibilities under the contract to apply for the permit, get the permit, as soon as you have the permit, hand it over to Lamar, along with the leases. The plain terms of the contract are that that was not the case. The permits were going to be issued to OMG in OMG's name. Excuse me, OMG's Outdoor Media Group. In OMG's name. Once my clients had the permits under the express terms of the contract, my client was required to build those signs. Now, once they built the signs, there was still an additional step. Lamar, at that point, had the option of rejecting the billboards. Well, I read the contract, and they don't have the option unless the billboards aren't satisfactory. I mean, they're required to take them if they're satisfactory. Understood, Your Honor. But that's – we're in the realm of speculation at that point. If you look at the district court's decision, what the district court said, what it ruled, was that after June 4th of 2003 – that's the effective date of the contract – no interest, no rights in the permits. And that's just not the case. Okay, let's assume that we read the contract the way you do it, that is to say that Lamar could reject and that your client now has those billboards. You say what? Then what's going to happen? Well, there's a multiple of things that could happen, Your Honor. We don't know with a certainty what would have happened. But let's – one thing that could have happened, Your Honor, is that the parties could have agreed to amend the agreement, allowed my client to keep those billboards, and put an advertisement on the billboards or put noncommercial messages on the billboards, Your Honor. That's just one option. And, in fact, what happens here, Your Honor, is that the city didn't issue the permits. We're here almost 10 years after this initial contract was first signed. The noncompete agreement is almost up as of that point. So as of 2013, my client can actually put up signs in Riverside County and San Bernardino County, notwithstanding the noncompete agreements. Counsel, may I ask you – I'm just trying to understand procedurally where we are with this case. So the old ordinance has been superseded, right? That's correct, Your Honor. But you're seeking damages for your client under the old ordinance. That's correct, Your Honor. And under Section 1983, cause of action? That's correct. So in order for there to be damages under 1983, wouldn't your client have to have an intention to itself use the billboards for speech purposes? Yes, Your Honor. And isn't Mr. Gunderson's testimony exactly the opposite, that your client did not ever have the intention of using the billboards for speech? But that's only, Your Honor, that's only because he misread the contract. Mr. Gunderson's – Mr. Gunderson's testimony was based on his understanding of the contract, which was that once the permits were issued, he had to hand them over. But that's not – that doesn't square with the contract. What if I read the contract the same way he did? Excuse me, Your Honor. He's misunderstanding it, too. What if I read the contract the same way Mr. Gunderson read the contract? Well, here's the thing, Your Honor, right? This is on a motion for summary judgment. So that's an issue of fact. Well, but in my view, if I read the contract the same way he does, there's no conflict. I mean, there's nothing – I mean, there's no dispute. There's no material issue. But, Your Honor, the contract – the terms of the contract are clear and ambiguous. Yeah, that's – I agree. And I think he got it right. I appreciate that, Your Honor, and it seems like I'm – Let's assume, because this is where I am with the case, and my colleagues may or may not – we don't discuss these cases typically before we get on the bench, and that's true for this one. Let's assume Mr. Gunderson interpreted the contract correctly and that once the permits are granted, once the billboards are built, Lamar has an obligation to take. And further, Gunderson is not going to put up any noncommercial signs. That's what he says. He says, no, that's Lamar's business. They can do it or not. On that assumption, how are you – how is your client entitled to any money? I know where Your Honor is going, and you're right. If that series of steps actually had taken place, Your Honor, we would not be standing here. Well, I mean, it didn't take place. It's a hypothetical that it didn't take place. But if that's how the contract is supposed to work, how are you – how is your client entitled to any money? We would not, Your Honor, but that's not the way the contract is supposed to work. As a matter of fact, the Court found that after June of 2003, my client had no rights in those permits. And that's just not accurate, Your Honor. If you look at the language of the contract, if you look at the party that actually applied for the permits, that's my client. That's outdoor media group, Your Honor. But he has an obligation, or Lamar has the obligation to pick up both the permits and the billboards. Assuming the permits are granted, Mr. Gunderson's company has the right – has the obligation to build them. Now, his testimony appears to be possibly that we take a deduction and they build them, but I don't read it quite that way. As I read his testimony, it is the obligation to build. And he's factored in in his calculation how much it will cost him to build, and his net profit is going to be $1.28 million. I appreciate that, Your Honor. I don't read the testimony the same way. I think if you actually look at the testimony that the Court is referring to, it actually supports the view that Mr. Gunderson just simply misunderstood the contract. Because Mr. Gunderson – it was Mr. Gunderson's view that he was going to get $1.28 million from Lamar without any obligation of actually putting up the signs. I don't think he said that. That's the way that I read it, Your Honor. And – but I think the salient point is – was the point by district court below that my client had no interest in the signs after June 4th of 2003. And that's just not – that's just not supported by the facts, Your Honor. So if we don't accept your argument that Mr. Gunderson misread the contract, do you lose? I – that question gets right to the point, Your Honor. That's called a zinger. It's called a zinger, Your Honor. And all I would ask the Court to do is consider the procedural posture of this case. We're on a motion for summary judgment. All inferences have to be in my client's favor. This is a factual dispute. The language of the contract is clear. There's misunderstanding by Mr. Gunderson as to what that contract language required of him. That creates an issue of fact. Well, no, it can – at most, it creates an issue of what does the contract mean, not he said, she said. It's pretty clear what he said, and then we have the contract. And you're saying that what he said is inconsistent with what the contract says, so all we've got to do is read the contract. That's exactly what I'm saying, Your Honor. And I read it. Well, the way that I read the contract, Your Honor, is that the point is who has an interest in the permits after June 4th of 2003? Who has a real interest in those permits? If the permits had been issued by the city on June 5th of 2003, who would have rights and interest in those permits? And that's clearly my clients. If the permits had been issued by the city on June 5th of 2003, who would have rights and interest in those permits? There were going to be issues in my client's name. Is this a signed-code shakedown? It's not, Your Honor. All I can say, Your Honor, is that my clients applied for these permits with the expectation that they would be granted. They never thought that we'd be standing here. I'd never heard of a signed-code shakedown before this case. And, in fact, from what little I can tell and infer, this is actually not a signed-code shakedown. I mean, Mr. Gunderson strikes me from his testimony as an exceptionally straightforward, honest man who just thought this was how this was supposed to work. Now, it may fit into a pattern of what other people are doing in signed-code shakedowns, but I'm quite willing to assume, as you're arguing, that this is not a sort of a manipulative shakedown case. And I appreciate that, Your Honor, and that doesn't get me where I need to go. It does. But what does get me where I need to go, Your Honor, is, as a matter of fact, who has an interest in the permits on June 5th of 2003, assuming they hadn't been issued? Who really has an interest in them? And that's my clients. To me, this is a third-party standing case. And you folks don't talk much about third-party standing. I mean, here's how you could win. In my mind, you don't. But here's, in my view, how you could win. If the permits had been granted, and constitutionally, I'm assumed, they should have been granted, at least with respect to noncommercial speech, who's entitled to that, and if that complied with the contract, which maybe, maybe not. If Lamar ends up having to pay a net of $1.28 million for the right to put up noncommercial signs on four billboards, I think they're going to scream bloody murder. But assuming that that nonetheless obliges them to do that, I'll go that far. Your client is out $1.28 million. The First Amendment rights, however, are the rights of those who would be advertising on the signs, which, of course, is not your client. Nor, indeed, is it Lamar. It's those who Lamar would be permitting to advertise. So we're talking about third-party rights of those who eventually would put up the noncommercial advertisements on the signs. It's sort of, as it were, third-party standing, and one removed because it's not even Lamar. Well, there's a lot of case law on third-party standing in which vendors get to assert the rights of the purchasers. There are a whole lot of them. Craig v. Boren is probably the salient case from 1976. But this one doesn't strike me as coming within third-party standing for a whole host of reasons, one of them being that if there really are people who wish to assert their First Amendment rights, the people are in a better position than your client to do so. I disagree with that, Your Honor. If you look at the record, my client has a history of putting up his own opinions, his own ideas. Yeah, but as I read the contract, that's not going to happen. That's not what's at issue. What's at issue is the ability of others to put up noncommercial signs. Once Lamar owns the billboards and has the permits. Well, Your Honor, the way it usually happens is that the owner of the billboard has not only the right to, but actually does, in the case of my clients, put up their own noncommercial messages on their own billboards. I understand that. But now you're arguing back at the other step that your interpretation of the contract is correct. I'm saying, no, I read the contract the way Mr. Gunderson read it. And again, Your Honor, all I would ask the panel to consider is that we're on a motion for summary judgment. Yeah. I believe that, at worst, this is an issue of fact and that it can't be decided on a summary decision. You're down to 25 seconds. Let's hear from the other side. Thank you, Your Honor. Good morning, Your Honor, honors, plural. Randall Morrison, Saban & Morrison, San Diego. I'm here for the City of Beaumont. This is the second time this case has been before this Court. I would like to direct the Court's attention to the record. Volume 4 of 7, page 568. This is the separate statement of undisputed facts. I presume it was prepared by Mr. Gonzalez because his signature is at the end of it. Page 568, purported undisputed fact number 5. If the city had issued the permits to OMG, Lamar would have purchased each of the eight faces for $1.28 million, the amount placed in the escrow account. The citation to the evidence is to the deposition of Randall Straub, the regional director of Lamar. I have that transcript in front of me. It is in Volume 3. I am on page 438. My question to him. And is it your understanding that if the city issued the CUPs and if OMG built the signs, that Lamar would indeed have exercised their option and purchased all the faces? Answer. I believe at that time, my interjection, yes. Answer. That we would have purchased them, yes. So it's really irrelevant about whose duty it was to build the signs if the permits were issued. The relevant issue when Mr. Gunderson is seeking money damages from the city for his free speech rights, then the question is, does he have any intention to put his own message on any signs? And his own testimony is absolutely crystal clear on that, no. I was getting out of the business. I was selling essentially all of my inventory. I was taking the money and running. Everything about messages on signs was up to Lamar. Our duty was to get the permits, and our mission was over at that point. That's the conclusive, that's the decisive point of the entire case. And if I were to ask you how you deal with third-party standing, I mean, I've given you my tentative conclusion, that is to say that there may be third-party First Amendment rights and those who might choose to advertise on the Lamar-owned billboards. Why isn't the vendor here, Mr. Gunderson or OMG, entitled to assert the third-party rights, First Amendment rights of those who might seek to advertise on those billboards? Standing to challenge the ordinance, yes. Standing to collect damages for other people who we don't know who they are, where they are, or what their message is? Absolutely not. No, no, no, no, you've misunderstood my question. Because of the way this works, if the permits had been granted, Gunderson's company gets $1.2 million. So he's not asking for damages to the people who would seek to advertise. He's asking for damages because the permits weren't granted. And because the permits weren't granted, there are going to be people who aren't going to be able to advertise. And so his ability to get the $1.28 million in damages on the contract is dependent upon the violation of the First Amendment rights. Why can't he assert the First Amendment rights of those who would put advertisements on the signs that the permits were granted? Again, for purposes of challenging the validity of the ordinance, yes. For purposes of collecting damages on their behalf, absolutely not. The ruling from this court the first time it came here was he can only get damages for his own speech. It's crystal clear. Well, I understand that, but I guess my question wasn't very clear. I mean, there's a whole line of third-party standing cases in which we have vendors selling to would-be purchasers or wanting to sell to purchasers. Craig v. Boren is an example. I don't know if you remember the case. I don't know that case. It's the Oklahoma beer seller. The Oklahoma statute of the time says boys between the ages of 18 and 21 cannot buy 3-2 beer. Girls between the ages of 18 and 21 can buy 3-2 beer. A perfectly sensible ordinance in my view. The vendor who wanted to sell to boys between the ages of 18 and 21 without going through somebody who was going to buy it for them challenges on equal protection grounds. Now, the vendor wants damages. The right being asserted is not the vendor's right to get money, but rather the vendor's right to sell, and the right to sell is dependent on equal protection rights of the boys. The court says vendor gets to collect damages relying on the equal protection rights of the would-be purchasers. So damages you can get for the violation of somebody else's right if third-party standing is allowed. So why doesn't this case fall under the Craig v. Boren paradigm? Because of the scope of the remand. If we read carefully the decision the first time this case was before this court, there's only one tiny thread left. What kind of money damages are available to Mr. Gunderson for violation of his free speech rights? There's no free speech in a permit to put up a billboard. There's no free speech in erecting the billboard, whether it's done by Gunderson or by his contractor or by Lamar. So you have to stay on what is the scope of the case remaining after the first time it was here. Does it make a difference, counsel, that this case involves Section 1983 free speech right and the case that was described didn't? Does that make a difference to the analysis? I'm not familiar with the case that Judge Fletcher described. Okay, if you take it as a given that the case did not involve free speech rights, does that make a difference in your analysis? Well, I honestly wouldn't speculate, and it's all new to me. I've never heard of this case. I've done dozens and dozens of billboard cases. And the last section of the brief that we filed goes into the whole business about there's no free speech in the structure itself. It doesn't matter if you're talking about a sign, talking about a church building, talking about a news rack, any kind of physical structure which might be used for some kind of activity related to the First Amendment. Once it's built, there's no free speech involved in the permitting of it and in the building of it. It's only after it's completed, proper, legal, and then the free speech activity takes place. That's when we're into the First Amendment, not before. Well, next time you start doing another one of these cases, you may want to read the whole long line of third-party standing cases. All right. I have to say, I'm inclined to think that under the principle of third-party. I'm inclined to think that under the principle of third-party standing cases and Craig versus Boren, you win nonetheless. Yeah. But you may wish to look at that line of cases. We shall. In conclusion, I'd like to just quote from the district judge's ruling on this case. Judge Timlin spent a long time deciding this case. It's a long, very careful analysis. Because of the uncontroverted facts and the limited remand by the Ninth Circuit to examine whether an impermissible regulation of noncommercial speech deprived these specific plaintiffs of their First Amendment rights. The court concludes as a matter of law that plaintiffs O.M.G. and Chance may not collect money damages for deprivation of their First Amendment right of free speech where there is no evidence demonstrating their intent to engage in any form of protective speech, commercial or noncommercial. I'd also like to point out that all of this stuff came up in the district court when we had dueling motions for summary judgment. And at that time, when we filed our brief, we quoted extensively from Mr. Gunderson's testimony. And there was no attempt to fix it, no attempt to save it, no attempt to come in with a new declaration from Mr. Gunderson saying, oh, I was confused, I didn't read the contract, sorry, sorry, here's nothing. No. All of that was waived. Thank you very much. Would you like a minute to respond? Yes, Your Honor. Just very quickly. They're not uncontroverted facts. I hear the city's position. I hear Your Honor's position. The contract says one thing. Mr. Gunderson says something that's completely the opposite of the contract. I stand in my position on that. If the court would like further briefing on the third-party standing cases, I would certainly be willing to submit a one- or two-page letter brief on that issue as well, if the court would like further briefing on that. Don't think about briefing unless you get an order from us. Okay. Thank you. Thank you very much. The Case Outdoor Media Group v. City of Beaumont now submitted for decision. Thank you both for your arguments. And we are in adjournment for the week. All rise. This court for this session stands adjourned.
judges: Mills, Fletcher, Rawlinson